IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

VASCULAR VENTURES, LLC, )
    Plaintiff, )
     )
v. ) CIVIL ACTION: 16-00481-KD-B
     )
AMERICAN VASCULAR ACCESS, LLC )
and JANET R. DEES, )
    Defendants. )

# ORDER

This matter is before the Court on Defendants' motion for summary judgment (American Vascular Access, LLC (Access) and Janet R. Dees (Dees)) (Doc. 91), Plaintiff Vascular Ventures, LLC (Plaintiff)'s Response (Doc. 93) and Defendants' Reply (Doc. 99).

## I.   Background

This action stems from Plaintiff's August 9, 2016 complaint, 02-CV-2016-901640, filed in the Circuit Court of Mobile County, Alabama against Dees, Access, "any subsidiary" of Access "formed after December 30, 2009[,]" and "nominal" defendants. (Doc. 1-2). On September 12, 2016, Access removed the case on the basis of federal diversity subject matter jurisdiction. (Doc. 1). On December 7, 2016, the Court issued an R&R on the parties' respective motions to dismiss, transfer and remand, through which the Court denied remand and transfer, dismissed all defendants except Access and Dees, and dismissed all claims except for breach of contract based on a December 30, 2009 letter (Count One), promissory fraud (Count Three) and civil conspiracy (Count Six). (Doc. 28). On December 28, 2016, the R&R was adopted. (Doc. 29); Vascular Ventures, LLC v. American Vascular Access, LLC, 2016 WL 7471642 (S.D. Ala. Dec. 7, 2016), *R&R adopted* (S.D. Ala. Dec. 28, 2016).[1] On August 18, 2017, Access and Dees

---

1 For clarification: "[n]otwithstanding…[Access'] repeated representations….that it is a party to the Purchase Agreement, the agreement itself places the matter beyond dispute that…[it] is neither a signatory nor a party to that agreement[.]" Id. at n.6. The Court found as follows with regard to the relevance of the Purchase

moved for summary judgment on the three (3) remaining claims.

## II. **Findings of Fact**[2]

From 2008-2009, Access negotiated with Plaintiff and its members (physicians)[3] to purchase a 40% interest in Plaintiff's lab-based interventional nephrology practice in Mobile, Alabama (which ultimately became Mobile Vascular Labs, LLC). As an "additional incentive" to Access' payment to Plaintiff for that 40% interest, Access promised to reserve a minimum of up to 10% of Access' portion of future joint ventures and business opportunities for Plaintiff.

In November 2009, the parties discussed what those future opportunities might entail. Also, Access' President Janet Dees (Dees) explained to Plaintiff that she intended for the ventures to be entered into by separate new holding companies that would be created as co-owners in other dialysis access clinics. (Doc. 95-2 SEALED (Dep. Dees at 181-189). Specifically, separate holding companies, originating from Access, would be formed to hold equity positions in new ventures through which Access would perform development and management services for the holding companies and have an ownership interest in them.

---

Agreement, and whether the Side Letter was incorporated into the Purchase Agreement as an "ancillary agreement":

> It is without dispute in this case that the parties to the December 30, 2009, Purchase Agreement are nine individual doctors….(all non-parties to this case), M[obile] V[ascular] L[abs]… (a non-party to this case), and…[American Vascular Access Mobile Holdings, LLC] (a non-party to this case)…..Neither Plaintiff nor any Defendant in this case alleges that it is a party or an intended third-party beneficiary to that Purchase Agreement….On the other hand, with respect to Plaintiff's claim that the Side Letter agreement is a stand alone contract between…[Access], Dees, and…[Plaintiff], the Court agrees that Plaintiff has at least stated a claim against these Defendants for breach of contract as to this agreement….The Side Letter document shows an executed, binding agreement signed by Dees, ostensibly on behalf of…[Access], to reserve a minimum of 10% of….[Access'] future business ventures for investment by…[Plaintiff] and its doctor members, in exchange for which Plaintiff/its doctor members would sell 40% off…[the Labs] to…[Access'] affiliate, [AVA]…

Id. at *14-15. The Court dismissed Plaintiff's breach of contract claim based on the Purchase Agreement.

[2] On summary judgment the Court must "resolve all issues of material fact in favor of the [non-movant], and then determine the legal question of whether the [movant] is entitled to judgment as a matter of law under that version of the facts." McDowell v. Brown, 392 F.3d 1283, 1288 (11th Cir. 2004).

[3] Plaintiff and its physician members will be referenced as Plaintiff in this Order.

(Doc. 91-1 (Dep. Dees at 493); Doc. 95-2 SEALED (Dep. Dees at 183-185).

The parties discussed the first such "deal" for a business in the Atlanta, Georgia area. On November 24, 2009, Access' Chief Operating Officer William G. Wright (Wright) e-mailed preliminary figures and estimates for the Atlanta "deal" (including investment cash flow, revenue assumptions, start up costs, etc.) to Plaintiff c/o Butera (Plaintiff's President), with a copy to Dees.[4] (Doc. 95-4 SEALED; Doc. 91-2 (Dep. Butera at 170-171, 173); Doc. 91-2 at 54; Doc. 95-3 SEALED (Dep. Wright at 154); Doc. 95-6 SEALED (Dep. Butera at 68)). On December 30, 2009, Access issued a letter to Plaintiff (the Side Letter) stating the parties' intentions:



December 30, 2009

Dr. Phil Butera
Dr. Craig Klinemann
Vascular Ventures L.L.C.
Mobile, Alabama

Doctors,

Pursuant to our letter of intent dated March 11, 2009 under section 8, titled Additional Incentive. As additional incentive to Vascular Ventures or its physician members, American Vascular (AVA) will reserve a minimum of up to 10% of AVA's portion of any future joint venture or business opportunity that may arise out of AVA's general course of business, for Vascular Ventures doctors to invest. Vascular Ventures and its physicians will be offered the same terms and conditions as other investors and may elect or be offered additional ownership beyond 10%, but will always be offered at least 10% of AVA's position.

It is understood that Vascular Ventures or its physician members involvement in these opportunities are optional and is on a "as may arise" basis. Investment in these ventures will most likely occur as a silent partner in the vascular access entity that will be created. Investment in these deals will be solely optional on the part of Vascular Ventures.

Should Vascular Ventures provide information or additional contacts, support and opportunities to American Vascular that results in a business opportunity, then AVA will reserve additional ownership and investment opportunity to Vascular Ventures up to a minimum of 25% of AVA's portion. This opportunity is again at the option of Vascular Ventures.

Janet R. Dees
_Janet R. Dees_
American Vascular Access

---

[4] Per Plaintiff, Butera never saw until his deposition (and does not recall) the email from Access. Nor did he know that an offer regarding the Georgia venture "had been rendered" from Access, adding that Access was instructed to copy Harry Bishop. (Doc. 91-2 (Dep. Butera at 170-171, 173)).

3

(Doc. 91-2 at 52).

Dees testified that per the Side Letter, Access planned for holding companies to be created for new vascular centers that Access might do business with and have ownership interest in, and Plaintiff would then have opportunities to buy at least a 10% interest in those holding companies. (Doc. 95-2 SEALED (Dep. Dees at 186-186); Doc. 95-3 SEALED (Dep. Wright at 240)). Per Access, the Side Letter created a contractual obligation on the part of Access to offer to Plaintiff at least a 10% interest in future investment opportunities. (Doc. 95-2 SEALED (Dep. Dees at 364-365)). See also (Doc. 95-3 SEALED (Dep. Wright at 217) ("Our [Access] intent with them was always just as the document reads, to give them a 10 percent offering on the new deals….."). The Side Letter was executed as part of the overall closing for Access to be a 40% member in Mobile Vascular Labs. (Doc. 95-2 SEALED (Dep. Dees at 356).

On February 8, 2010, approximately six (6) weeks later, Access entered into the first of a series of ventures[5] without Plaintiff. (Doc. 93 at 5 (citing 95-5 SEALED); Doc. 95-3 SEALED (Dep. Wright at 196); Doc. 95-2 SEALED (Dep. Dees at 365)).[6] This first venture resulted in Access (c/o the Florida holding company it created for said purpose, AVA Newman Holdings, LLC) purchasing a 45% equity interest in the Georgia dialysis access clinic, without Plaintiff. (Doc. 95-5 SEALED); Doc. 95-3 SEALED (Dep. Wright at 213)). Plaintiff alleges that thereafter, Access entered into *other* ventures -- 13 known -- without Plaintiff. The parties dispute what was communicated between them and what (and whether) the promised 10% interest offers for new ventures were made from Access to Plaintiff.

---

5 Relating to 14 (known) entities: AVA Sarasota Holdings, LLC; AVA Newnan Holdings, LLC; AVA Columbus Holdings, LLC; AVA Douglas Holdings, LLC; AVA Saint Louis Holdings, LLC; AVA Valley Holdings, LLC; and AVA Duval Holdings, LLC; Foothill Vascular Center, Inc.; Manasota Vascular Center, LLC; Newnan Vascular Center, LLC; Columbus Vascular Center, LLC; Gateway Vascular Center, LLC; Valley Interventional Medical Associates, PLLC; and Duval Vascular Center, LLC.

6 Per Wright, Plaintiff's 10% interest in this Georgia venture would have been about $29,000, but the opportunity was not mentioned to Plaintiff because "[t]he conversation never went that far." (Doc. 95-3 SEALED (Dep. Wright at 213-214)).

## III. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Rule 56(c) provides as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c).

Defendants, as the parties seeking summary judgment, bear the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the

evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992).

## IV. Breach of Contract

At the outset, the parties dispute which state's law applies to the breach of contract claim. This Court exercises diversity-of-citizenship jurisdiction over this case such that the choice of law principles of Alabama, the forum state, apply. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941); Fioretti v. Mass. Gen. Life Ins. Co., 53 F.3d 1228, 1235 (11th Cir. 1995). Alabama applies the law of the state where the contract was formed (made) (*lex loci contractus*) unless: 1) a provision in a contract specifies the governing law (Cherokee Ins. Co. v. Sanches, 975 So.2d 287, 292 (Ala. 2007) and Fairhope Piggly Wiggly-Inc. v. PS2 LED, Inc., 2017 WL 2865528, *3 (S.D. Ala. Jul. 5, 2017);[7] or 2) the contract is to be performed in another state (Owens v. Superfos A/S, 170 F.Supp.2d 1188, 1194-1195 (M.D. Ala. 2001)). "A contract is usually governed as to its nature, obligation, validity, and interpretation by the law of the place where it is made, unless it is to be wholly performed in another state, in which case the place of performance…must govern." Western Union Telegraph Co. v. Hill, 50 So. 248, 251 (Ala. 1909). See also J.R. Watkins v. Hill, 108 So. 244, 245 (1926) (emphasis in original) (same).

The Side Letter between the parties contains no choice of law provision and does not specify performance in a state other than Alabama. As such, the Court looks to the state where the contract was formed (made), unless the contract specifies that it is to be performed in a different state as that state's law will then govern. As to formation, "[t]he elements of a valid contract include offer and acceptance, consideration, and mutual assent or a meeting of the minds as to the terms essential to the formation of the contract." Ex parte Grant, 711 So. 2d 464, 464 (Ala. 1997). Univalor Trust, SA v. Columbia Petroleum,

---

7 New Hampshire Ins. Co. v. Hill, 516 Fed. Appx. 803, 805 (11th Cir. 2013) ("Alabama's lex loci contractus doctrine….requires that Alabama courts interpret contracts according to the law of the state in which they were made[]").

LLC, 2017 WL 2303999, *9 (S.D. Ala. May 25, 2017). A contract is formed (made) upon acceptance (the expression or manifestation of assent to the terms offered) of an offer, and acceptance is the last act necessary to complete a contract. See, e.g., Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc., 363 F.3d 1089, 1093 (11th Cir. 2004) ("the 'last act necessary to complete a contract is the offeree's communication of acceptance [of the offer] to the offeror[]'"); Fairhope Piggly Wiggly-Inc. v. PS 2 LED, Inc., 2017 WL 2865528, *5 (S.D. Ala. Jul. 5, 2017) (discussing mutual assent to the terms offered as manifested by acceptance, and acceptance as then forming the contract); Cordova v. R&A Oysters, Inc., 169 F.Supp.3d 1288 (S.D. Ala. 2016) ("a contract was formed by acceptance of an offer[]").

The Side Letter (the contract) was drafted by Access. (Doc. 95-2 SEALED (Dep. Dees at 355). The offer was extended from Access to Plaintiff in Alabama. (Doc. 3 at 2; Doc. 93 at 9). The offer from Access to Plaintiff was to buy Plaintiff's 40% interest in Plaintiff's Alabama entity (Mobile Vascular Labs, LLC) and to "reserve a minimum of up to 10%" of any future joint venture or business opportunity for Plaintiff to invest, in return for consideration of $3,185,100. Access' offer was accepted when Plaintiff agreed to the terms offered by Access (to sell its 40% interest in the entity and receive the right to invest up to 10% in Access' future ventures) and received the $3,185,000 consideration. That acceptance, by an Alabama entity and its Alabama physicians, occurred in Alabama. The Side Letter was thus formed in Alabama, and Alabama law governs the breach of contract claim.

A. **Dees**

With regard to Dees, an individual and the President of Access, she cannot be held personally liable for breach of contract. The evidence indicates that the Side Letter was signed and executed by Dees, while acting in her capacity as Access' President, and on that entity's behalf. There is no evidence that Dees signed or executed the Side Letter in her individual or personal capacity. There is nothing in the Side Letter indicating a personal promise or obligation on the part of Dees to Plaintiff, and there is no evidence before the Court of such. "It is axiomatic that officers of a corporation are merely agents of the

corporation and are not personally liable for obligations incurred by the corporation in the usual course of business, absent a statute, charter provision, or personal agreement to the contrary. *Whitehead v. Davison Oil Co. Inc.,* 352 So.2d 1339 (Ala.1977)." Tallant v. Grain Mart, Inc., 432 So.2d 1251, 1254 (Ala. 1983). Thus, summary judgment is **GRANTED** on this claim against Dees. The Court's discussion of Plaintiff's breach of contract claim below, will be directed only to Access.

**B.    Access**

Plaintiff contends that Access breached the contract because it "did not make a formal offer to join any of the new ventures." (Doc. 99-1 (Dep. Butera at 65)). To prevail on its breach of contract claim, Plaintiff must establish the existence of a valid contract, Plaintiff's performance under the contract, Access' non-performance and resulting damages to Plaintiff. Shaffer v. Regions Fin. Corp., 29 So.3d 872, 880 (Ala. 2009). For the reasons which follow, summary judgment is **DENIED** as to this claim against Access.

**1.    The first element - a Valid Contract**

Access disputes the first element – a valid contract. Access contends the Side Letter is unenforceable because it: 1) is vague, uncertain and an indefinite option agreement; and 2) violates Alabama's rule against perpetuities as a perpetual option to buy stock. The Court is satisfied that the Side Letter is a valid contract.

As noted *supra* regarding formation, a valid contract requires an offer, acceptance, consideration, and mutual assent or a meeting of the minds as to the essential terms. Ex parte Grant, 711 So.2d at 464; Univalor Trust, 2017 WL 2303999, *9. Additionally, in Alabama:

> "[t]o be enforceable, the essential terms of a contract must be sufficiently definite and certain, and a contract that leaves material portions open for future agreement is nugatory and void for indefiniteness." *White Sands*, 998 So.2d 1042 (citations, quotation marks and brackets omitted). A contract can lack definiteness as to "time of performance, the price to be paid, *work to be done*, property to be transferred, or miscellaneous stipulations in the agreement." *Id.* (emphasis added).

> The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Id*. (quotation marks and emphasis omitted); *see also Smith v. Chickamauga Cedar Co*., 263 Ala. 245, 82 So.2d 200, 203 (1955) ("[I]f the offer is in any case so indefinite as to make it impossible for a court to decide just what it means, and to fix

8

exactly the legal liability of the parties, its acceptance cannot result in an enforceable agreement."). "Additionally, in order for an alleged contract to be considered void based on the indefiniteness of its terms, the indefiniteness must reach the point where construction becomes futile." *Poole v. Prince*, 61 So.3d 258, 275 (Ala.2010) (quotation marks and brackets omitted). "A court will, if possible, interpret doubtful agreements by attaching a sufficiently definite meaning to a bargain if the parties evidently intended to enter into a binding contract." *Id*….

Nihon Rufuto Co., Ltd. v. Nidek Medical Prod., Inc., 437 Fed. Appx. 782, 788 (11th Cir. 2011).

First, as to the nature of the Side Letter, Access argues it is vague, uncertain and indefinite as an "agreement to agree," "agreement to offer without any obligation to accept," an unenforceable agreement to later agree on a future lease extension, or an agreement to later offer. Access states the terms are undefined, left to be negotiated (i.e., vague and indefinite), give the parties the unrestricted right to determine future performance, and fail for indefiniteness. Access explains: "it is not an agreement as to any identified joint venture or business agreement…it is an agreement to make an offer and potentially agree in the future on unstated terms that require future negotiation." (Doc. 91 at 8).

However, as already concluded by this Court:

> The Side Letter document shows an executed, binding agreement signed by Dees, ostensibly on behalf of…[Defendants], to reserve a minimum of 10% of …[Defendants'] future business ventures for investment by…[Plaintiff] and its doctor members, in exchange for which Plaintiff/its doctor members would sell 40% of…the [Labs] to…[Defendants'] affiliate….

Vascular Ventures, 2016 WL 7471642, *13. Additionally, Access' summary judgment position is contradicted by its officers' testimony as to the nature of the Side Letter. Access, via Dees and Wright, testified that per the Side Letter, Plaintiff had opportunities to buy at least a 10% interest in any of Access' future business. (Doc. 95-2 SEALED (Dep. Dees at 186-187); Doc. 95-3 SEALED (Dep. Wright at 240)). Indeed, per Access, the Side Letter instantly created a contractual *obligation* on the part of Access, at the time it was executed, to offer to Plaintiff at least a 10% interest in future investment opportunities. (Doc. 95-2 SEALED (Dep. Dees at 364-365)). See also (Doc. 95-3 SEALED (Dep. Wright at 217) ("Our [Access] intent with them was always just as the document reads, to give them a 10 percent offering on the new deals….").

9

Moreover, the Side Letter does not leave material portions open for future agreement nor does it lack definiteness as to time of performance, the price to be paid, work to be done, property to be transferred, etc. Upon issuance of the Side Letter, Access immediately reserved to Plaintiff the right to invest a minimum of up to 10% in Access' future ventures. The time of performance was when Access entered into a future venture, which included investors. The price to be paid by Plaintiff for the investment was defined as the same term and conditions offered to other investors. "[A] valid contract may be conditioned upon the happening of an event, even though the event may depend upon the will of the party who afterwards seeks to avoid its obligation." Z.T. Mozley v. Boen, 143 So.2d 304, 305 (Ala. Civ. App. 1962). In sum, the Side Letter's terms are "reasonably certain" because the terms provide a basis for determining the existence of a breach and for giving an appropriate remedy.

Second, despite Access' contentions, the Side Letter is exempt from Alabama's rule against perpetuities. As alleged, after the Side Letter was executed, Access entered into business ventures with numerous limited liability companies without reserving a minimum of up to 10% of Access' portion of those business ventures for Plaintiff, as promised. "'An interest in a limited liability company is personal property.' ALA. CODE § 10–12–6 (1975)." Parsons & Whittemore Enterp. Corp. v Cello Energy, LLC, 2009 WL 323081, *3 (S.D. Ala. Feb. 7, 2009). "'In Alabama…the rule against perpetuities applicable to personal property and to land shall be the same.' ALA. CODE § 35–4–4 (1975)." Id. Additionally, "[m]uch as a vested right that only becomes relevant on the occurrence of a future event does not violate the rule against perpetuities, a vested right for which payment is due in the future also does not violate the rule against perpetuities." Id. at *5.

As explained in Robertson v. Murphy, 510 So.2d 180, 181-183 (Ala. 1987) (emphasis added):

> "The common law rule against perpetuities provides that no interest is good unless it must vest, if at all, not later than twenty-one years after some life in being at the creation of the interest….
>
> ….the Supreme Court of Wyoming, in *Hartnett v. Jones*, 629 P.2d 1357 (Wyo.1981), held that ***a***

10

***preemptive right to purchase in a joint venture contract was not subject to the rule….*** The court cited and discussed *Weber v. Texas Co.*, 83 F.2d 807 (5th Cir.1936)…; *Oliner v. City of Englewood*, 42 Colo.App. 106, 593 P.2d 977 (1979); *Robroy Land Co. v. Prather*, 95 Wash.2d 66, 622 P.2d 367 (1980), for the proposition that the rule did not apply with regard to preemptive rights….

….this case is similar to *Dozier v. Troy Drive-In Theaters, Inc.*, 265 Ala. 93, 89 So.2d 537 (1956). *Dozier* dealt with a lease of land containing an option to purchase exercisable during the term after one year. The appellant in *Dozier* argued that such an option was violative of the rule in that no reference to a life in being was stated. The Court held that the option was an exception and not subject to the rule against perpetuities….

***The Wyoming court in Hartnett described Dozier as holding "that the option or preemptive right simply is an exception to the rule of perpetuities because it creates an estate on a condition subsequent to which the rule does not apply.*** " *Hartnett v. Jones*, 629 P.2d at 1362. The Court in *Dozier*, partially relied upon the English courts for its pronouncement of the exception:

> …we are standing by the principle first stated in England in the Cartwright case, supra, that the reservation of a right to repurchase creates a conditional fee, and is a presently reserved vested right in the grantor, although its exercise is dependent on a future contingency.
>
> In that connection our case of *Hinton v. Gilbert*, [221 Ala. 309, 128 So. 604], is reported in 70 A.L.R. 1192 as a leading authority, and our case of *Libby v. Winston, supra*, is noted as supporting it. These cases are based upon a construction of the instrument as conveying a conditional fee, thereby reserving a right which never passed from the grantor but [was] exercisable on a contingency. Therefore, both the grantor and grantee have an interest in the fee which they can convey and thereby relieve the property of the exemption from trade which the rule seeks to prohibit. These cases have created a rule of property in this State which we should uphold.

265 Ala. at 104-05, 89 So.2d at 547.

"***The avowed object of the rule is to favor commerce and the circulation of property by preventing the right of absolute disposition from being tied up or restrained beyond a certain period.***" *Lyons v. Bradley*, 168 Ala. 505, 53 So. 224 (1910). As pointed out by the Supreme Court of Wyoming, ***preemptive rights do not inhibit the alienability of property***. See *Hartnett, supra*. Therefore, ***the rights are not contrary to the main objective of the rule.*** Based on the analysis of the Court in *Dozier, supra*, ***the preemptive right to repurchase created a conditional fee and this right is vested and presently reserved in the pre-emptioner. The preemptive right of first refusal*** as found in the partnership agreement ***is excepted from the rule against perpetuities****….*

Access contends that Plaintiff's interest is a perpetual option to purchase stock for which there exists only a "mere probability that...[Plaintiff's] interest will vest[]" and "there is at least some possibility" that Plaintiff's interest "will not vest" within 21 years. (Doc. 91 at 11-12). The Court is not persuaded. Following Access' logic, Plaintiff's interest was not created and/or did not vest when the Side Letter was

11

executed, and would only be created and/or vest, and (apparently continually) re-vest, upon the occurrence of a future joint venture or business opportunity -- i.e., there would *never* be a *complete vesting* of Plaintiff's right/interest. In contrast, a reading of the clear terms of the Side Letter confirm that *upon its execution*, Access *immediately reserved* to Plaintiff the right to invest a minimum of up to 10% in Access' portion of its future ventures and *immediately obligated* Access to offer such to Plaintiff -- "*will* reserve," "*will* be offered" and "*will always* be offered." Access' officers testified that the Side Letter created an instant "obligation," Access' contractual obligation, to offer Plaintiff the 10% investment opportunities. (Doc. 95-2 SEALED (Dep. Dees at 186-186, 364-365); Doc. 95-3 SEALED (Dep. Wright at 217, 240)). See also (Doc. 95-3 SEALED (Dep. Wright at 217)). Thus, Plaintiff's *right* (interest) was created and/or vested upon execution of the Side Letter.

Plaintiff's *exercise* of that right (interest) is a different matter. That Plaintiff's interest becomes relevant on the occurrence of a future joint venture/business opportunity and is a vested right for which payment is due in the future, does not violate the rule against perpetuities. Parsons, 2009 WL 323081, *5. This is because Plaintiff's interest is a preemptive right under Alabama law to purchase "a minimum of up to 10%" and is a "presently reserved" and "vested" right for which payment is due in the future. Robertson, 510 So.2d at 183.

2. **The remaining elements**

Concerning the remaining three (3) elements for a breach of contract claim – Plaintiff's performance under the contract, Access' non-performance, and resulting damages – the Court finds as follows. As to performance, Plaintiff performed under the contract and Side Letter by selling its 40% interest in Mobile Vascular Labs, LLC to Access as promised.

With regard to Access' non-performance (the alleged basis for the breach of contract), the evidence establishes, for purposes of summary judgment, an issue of material fact. In addition to paying Plaintiff the agreed sum for the 40% interest in Mobile Vascular Labs, LLC (which is not in dispute), Access'

performance required it to immediately reserve the right to Plaintiff to invest up to a minimum of up to 10% in any of Access' future ventures. There exists a genuine issue of material fact as to whether Access breached the Side Letter due to its alleged non-performance on this particular contractual obligation. See, e.g., Penmont v. Blue Ridge Piedmont, 607 F.Supp.2d 1266, 1272-1273 (M.D. Ala. 2009) (to establish a successful breach-of-contract claim, a plaintiff must demonstrate not only the existence of a valid contract and that he performed under the contract, but also that the defendant failed to perform) (citing State Farm Fire and Casualty Company v. Slay, 747 So.2d 293, 303 (Ala.1999)).

Specifically, as noted *supra*, Dees testified that the Side Letter created a contractual obligation on the part of Access to offer Plaintiff the 10% investment opportunities. (Doc. 95-2 SEALED (Dep. Dees at 365)). See also (Doc. 95-3 SEALED (Dep. Wright at 216-217) ("Our [Access] intent with them was always just as the document reads, to give them a 10 percent offering on the new deals…."). Following execution of the Side Letter, Access entered approximately 14 joint ventures/business opportunities (known to date) without Plaintiff. As explanation, Access asserts that "these opportunities were all discussed….[Plaintiff] just doesn't recall which ones or any of the details of the discussions[]" and "[t]he only dispute, perhaps, is that the opportunity wasn't presented to…[Plaintiff] in a form of their liking[.]" (Doc. 91-2 at 17 (citing Dep. Butera at 67-68, 137-140, 166-181)). "They [Plaintiff] didn't want anything to do with it." (Doc. 95-3 SEALED (Dep. Wright at 216-217)). See also Doc. 91-1 (Dep. Dees at 488); Doc. 95-2 SEALED (Dep. Dees at 366)).

In contrast, Plaintiff asserts that while Dees (for Access) may have communicated and informed Plaintiff (c/o Butera) about "new ventures," "every time a new venture was mentioned, there was always something…they weren't interested in having us join[]" and Access "always had" a reason to exclude Plaintiff. (Doc. 99-1 (Dep. Butera at 68, 70-72, 74, 76)). "My…feeling is that...[Access] had no intention of including us in these new ventures" as there was always an excuse for "[e]very one [venture] I asked about." (Id. (Dep. Butera at 67-68); Doc. 91-2 (Dep. Butera at 67-68); Doc. 95-6 SEALED (Dep.

13

Butera at 69)). "[I]t was always why we couldn't participate. So my understanding was that they weren't interested in including us in any of these ventures." (Doc. 99-1 (Dep. Butera at 66)). Additionally, while Dees communicated about some "new ventures out there," "she never revealed that…Access had an equity position in these ventures. In fact, she denied that she had an equity position in these ventures, telling me they were management positions." (Doc. 91-2 (Dep. Butera at 142); Doc. 95-6 SEALED (Dep. Butera at 70-71)). Moreover, Butera testified that he never turned down offers from Access: "I never said I was not interested in any practice [venture][]" nor "respond that I wasn't interested." (Doc. 91-2 (Dep. Butera at 168, 178, 180-181). Per Butera, Dees simply "did not inquire into my [Plaintiff's] interest[.]" (Id. (Dep. Butera at 181). In light of the parties' differing versions of events, the Court is satisfied that Plaintiff has created an issue of material fact as to Access' non-performance.

Further, as for "resulting damages," Access represents that Plaintiff's claim of 10% interest for four (4) of the entities is "worth no less than $537,000 as of August 9, 2016." (Doc. 95-8 at 4 (Supp. Aff. Dees)). Plaintiff asserts that the damages amount are currently unknown but that it "will prove amounts above" the $537,000 figure "by a profit analysis of each of the subject" ventures from December 30, 2009 to the present. (Doc. 93 at 6 and note 5, and 8; Doc. 91-3 (Dep. Bishop at 181-184, 221)). Thus, the fact of damages has been sufficiently stated by the parties on summary judgment, but the amount remains a question of fact for the jury.

### V.    Tort Claims: Promissory Fraud & Civil Conspiracy

Alabama choice of law rules apply the doctrine of *lex loci delicti* to tort claims: the law of the state in which the injury occurred governs the substantive rights of the injured party. Colonial Life & Acc. Ins. Co. v. Hartford Fire Ins. Co., 358 F.3d 1306, 1308 (11th Cir. 2004). Additionally, for fraud claims, courts look to the state in which the plaintiff suffered the economic impact. Glass v. Southern Wrecker Sales, 990 F.Supp. 1344 (M.D.Ala.1998). Per Chambers v. Cooney, 2007 WL 2493682, *11 (S.D. Ala. Aug. 29, 2007) (emphasis added):

> …the place of injury "is the locale in which the last event necessary to make a defendant liable for an alleged tort occurs."….*see also Velten v. Regis B. Lippert, Intercat, Inc.,* 985 F.2d 1515, 1521 (11th Cir.1993) ("The place of the wrong is the jurisdiction where the harm was suffered or where the last event necessary to make an actor liable for the alleged tort takes place."). ***Where*, as here, *the injury in question is financial, the location where the financial injury was felt is determinative under lex loci delicti***….

See also Alabama Aircraft Indus., Inc. v. The Boeing Co., Inc., 2013 WL 1178720, *8 (N.D. Ala. Mar. 20, 2013) (same); Renasant Bank v. Park Nat. Corp., 2013 WL 1499580, *7 (S.D. Ala. Apr. 10, 2013) (applying the law of the state where plaintiff's business was located as they "could have suffered injury only in that state[]").

While the 14 entities (the future joint ventures/business opportunities) were formed in a variety of different states, the Court finds that the injuries (torts) to Plaintiff and its members (an Alabama limited liability company with Alabama citizen members) occurred in Alabama. This is because as alleged, the injury to Plaintiff and its members is financial and the location where the financial injury was felt was (is) in Alabama, the state where Plaintiff and its members are located and where they are alleged to have been deprived of promised financial opportunities. As such, Alabama law governs the tort claims.

A.  **Dees**

In the Complaint, Plaintiff alleges that "Dees promised/contracted" the terms of the Side Letter to Plaintiff, "[a]s a material inducement…individually…promised that any future joint venture or business opportunity…would be presented to Plaintiff for consideration[,]" and "[s]ince making those promises…has been instrumental in development new business opportunities[]" but "has not offered the Plaintiff…a chance to buy into and be a partner in the….ventures…..". (Doc. 1-2 at 7-9). On summary judgment, Plaintiff alleges that Dees "controlled the entities that took the future joint ventures or business opportunities" without Plaintiff and "had a personal duty to disclose these ventures and opportunities to the Plaintiff and is the only Defendant which could ensure that the new holding companies included Plaintiff." (Doc. 93 at 29). In response, Defendants move for summary judgment in Dees' favor on the basis that "she made no promise, contract, or action in her individual capacity." (Doc. 91 at 20).

As explained in Allstate Ins. Co v. Regions Bank, 2015 WL 4073184, *22 (S.D. Ala. Jul. 2, 2015):

> …Jones seeks summary judgment on the ground that was "operating as a Corporate Officer, Member, or Manager," and that he "never acted in an individual capacity."….This argument misapprehends fundamental principles of tort and agency law. The First Amended Complaint alleges that Jones committed certain tortious conduct…If Jones committed those torts, it makes no legal difference whether he did so in a representative / agency capacity or not. Either way, he would remain liable for his own tortious conduct. ...whether Jones acted in an individual or representative capacity is irrelevant.

In Alabama, "[a] corporate agent who personally participates, albeit in….her capacity as such agent, in a tort is personally liable for the tort." Ex parte McInnis, 820 So.2d 795, 798–799 (Ala. 2001). See also Prince Hotel, S.A. v. Blake Marine Group, 2012 WL 4711897, *5 (S.D. Ala. Oct. 2, 2012) ("If Zatezalo committed that tort, it makes no difference whether he did so in a representative capacity or not. Either way, he would remain liable for his own tortious conduct[]"); Bethel v. Thorn, 757 So.2d 1154 (Ala. 1999) ("Bethel argues that Thorn, as president of Diesel, can be held individually liable for the fraudulent acts or omissions he personally committed in his capacity as a corporate officer. We agree that this is a correct statement of law[]"); Ex parte Charles Bell Pontiac–Buick–Cadillac–GMC, Inc., 496 So.2d 774, 775 (Ala.1986) ("In Alabama, the general rule is that officers or employees of a corporation are liable for torts in which they have personally participated, irrespective of whether they were acting in a corporate capacity[]"); Crigler v. Salac, 438 So.2d 1375, 1379-1380 (Ala.1983) ("This rule does not depend on the same grounds as 'piercing the corporate veil'...."). As such, Defendants' motion, on the basis that Dees "made no promise, contract, or action in her individual capacity[,]" is **DENIED** as to the tort claims alleged against her.

B. <u>Access</u>

1. **Promissory Fraud**

As summarized by this Court in Vascular Ventures, 2016 WL 7471642, *16-17, 19: Plaintiff alleges that Access "fraudulently misrepresent[ed] and/or suppress[ed] the existence of joint ventures and business opportunities in which Plaintiff was entitled to purchase up to a 10% interest and that Plaintiff was

16

damaged…." Access contends on summary judgment that because the Side Letter is void as a matter of law, the promissory fraud claim must fail; or in the alternative, there is no evidence that Access intended to deceive Plaintiff. For those reasons detailed *supra*, the Side Letter is not void as a matter of law and thus, Access' argument is not persuasive on that basis.

As for Access' intent to deceive, the Court notes as follows. In Alabama, "[a] claim of promissory fraud is 'one based upon a promise to act or not to act in the future.'" Ex parte Michelin North America, Inc., 795 So.2d 674, 678 (Ala. 2001). To establish a claim for promissory fraud a plaintiff must show: 1) a false representation; 2) of a material existing fact; 3) reasonably relied upon by the plaintiff; 4) who suffered damage as a proximate consequence of the misrepresentation; 5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised; and 6) proof that the defendant had an intent to deceive. Southland Bank v. A&A Drywall Supply Co., Inc., 21 So.3d 1196, 1210 (Ala. 2008); Hunt Petroleum Corp. v. State of Alabama, 901 So.2d 1, 4 (Ala. 2004). See also e.g., G.F. Kelly Trucking, Inc. v. U.S. Xpress Enterp., Inc., 281 Fed. Appx. 855, 861 (11th Cir. 2008). "The burden is on the plaintiff to prove that when the promise was made the defendant intended to deceive...[t]he plaintiff cannot meet his burden merely by showing that the alleged promise ultimately was not kept...[i]t is well settled that 'a jury does not have untrammeled discretion to speculate upon the existence of [the requisite] intent [for promissory fraud].' There must be substantial evidence of a fraudulent intent that existed when the promise was made." Southland, 21 So.3d at 1212. See also Odom v. Southeast Supply Header, LLC, 2010 WL 1780367, *9-10 (S.D. Ala. Apr. 29, 2010). "Evidence of consistent, but unfulfilled, promises can in some cases amount to substantial evidence of an intent to deceive[,] and "[a] defendant's intent to deceive can be established through circumstantial evidence that relates to events that occurred after the alleged misrepresentations were made." Southland, 21 So.3d at 1212 (internal citations omitted).

In response to Plaintiff's promissory fraud allegations, Access contends that "these opportunities

17

were all discussed; Dr. Butera [Plaintiff] just doesn't recall which ones or any of the details of the discussions[]" and "[t]he only dispute, perhaps, is that the opportunity wasn't presented to…[Plaintiff] in a form of their liking[.]" (Doc. 91-2 at 17 (citing Dep. Butera at 67-68, 137-140, 166-181)). "Our [Access] intent with them was always just as the document reads, to give them a 10 percent offering on the new deals. They [Plaintiff] didn't want anything to do with it." (Doc. 95-3 SEALED (Dep. Wright at 216-217)). Access asserts Plaintiff is "simply confused." (Doc. 91 at 18). In contrast, Plaintiff asserts that at the time the Side Letter was drafted and issued, Access was in active and serious negotiations to enter into a future business opportunity with a third-party and successfully did a few weeks after the Side Letter was executed, but failed to include Plaintiff. See *supra*. As alleged, thereafter, Access entered into approximately 13 other ventures/business opportunities, without Plaintiff. According to Plaintiff, while Access communicated and informed Plaintiff (c/o Butera) about "new ventures," "every time a new venture was mentioned, there was always something…they [Access] weren't interested in having us [Plaintiff] join[]" and Access "always had" a reason to exclude Plaintiff. (Doc. 99-1 (Dep. Butera at 68, 70-72, 74, 76)). "My…feeling is that they [Access] had no intention of including us in these new ventures." (Id. (Dep. Butera at 68)). Plaintiff asserts that an inference can thus be drawn of Access' intention to deceive at the time the Side Letter was prepared. "[F]or the purposes of a promissory-fraud claim, 'the factfinder may consider that failure [the failure to perform the promised act] together with other circumstances, in determining whether, at the time the promise was made, the promisor intended to deceive.'" Mantiply v. Mantiply, 951 So.2d 638, 653-654 (Ala. 2006) (quoting Byrd v. Lamar, 846 So.2d 334, 343 (Ala. 2003); Ex parte Grand Manor, Inc., 778 So.2d 173, 182 (Ala. 2000)).

Plaintiff's evidence and allegations, showing the circumstances surrounding the Side Letter and Access' actions, might persuade a jury that Access intended to deceive Plaintiff. Drawing all inferences in Plaintiff's favor, "fair-minded persons in the exercise of impartial judgment…[could] reasonably infer the existence of" Access' intent not to perform and intent to deceive at the time of the making and issuance of

the Side Letter. See, e.g., Beiersdoerfer, 953 So.2d at 1205. See also Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1160 (Ala. 2003); Padgett v. Hughes, 535 So.2d 140, 142 (Ala. 1988). Thus, there is a genuine issue of material fact. Scott v. Dixie Homecrafters, 125 F.Supp.2d 1311, 1315 (M.D. Ala. 2000). As such, summary judgment is **DENIED** on this claim at this time on that basis.

2. **Civil Conspiracy**

As summarized by this Court in Vascular Ventures, 2016 WL 7471642, *16-17, 19: Plaintiff alleges that Defendants "conspired….agreed to do something unlawful, i.e., commit fraud, in order to prevent Plaintiff from knowing about, and taking advantage of, investment opportunities that Defendants created after December 30, 2009…." "The elements of civil conspiracy in Alabama are: (1) concerted action by two or more persons to (2) achieve an unlawful purpose or a lawful purpose by unlawful means. *Luck v. Primus Auto. Fin. Servs., Inc.,* 763 So.2d 243, 247 (Ala.2000)." J&M Assoc., Inc. v. Romero, 488 Fed. Appx. 373, 375 (11th Cir. 2012). "[A] plaintiff alleging a conspiracy must have a valid underlying cause of action…A civil conspiracy claim fails if the underlying act or acts do not support an action…." Catlin Syndicate Ltd. v. Ramuji, LLC, 2017 WL 3581722, *11 (N.D. Ala. Aug. 18, 2017). See, e.g., Funliner of Alabama, LLC v. Pickard, 873 So.2d 198, 211 (Ala. 2003) (same); Goolesby v. Koch Farms, LLC, 955 So.2d 422, 430 (Ala. 2006) (same).

Plaintiff alleges that Defendants conspired to fraudulently misrepresent and/or suppress the existence of joint ventures and business opportunities in which Plaintiff was contractually entitled to purchase up to a 10% interest. (Doc. 1-2 at 16). As such, the underlying action of Plaintiff's civil conspiracy claim is the promissory fraud claim. Defendants assert that because there is no underlying claim, Plaintiff's civil conspiracy claim fails. For those reasons stated *supra*, issues of material fact exist for Plaintiff's promissory fraud claim and thus, the same holds true for civil conspiracy. As such, summary judgment is **DENIED** on this claim at this time.

## VI. Conclusion

Based on the foregoing, it is **ORDERED** that Defendants' motion for summary judgment is **DENIED in part** and **GRANTED in part** as follows: **DENIED** as to breach of contract as to the Side Letter (Count One) against Access; **GRANTED** as to breach of contract as to the Side Letter (Count One) against Dees; and **DENIED** at this time as to promissory fraud (Count Three) and civil conspiracy (Count Six) for both Access and Dees.

**DONE** and **ORDERED** this the **16th** day of **October 2017.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**CHIEF UNITED STATES DISTRICT JUDGE**